# Continuation of Federal Prisoner Detention Efforts During United States Marshals Service Appropriation Deficiency

It is doubtful that the "authorized by law" exception to the Antideficiency Act would allow the United States Marshals Service to continue to provide prisoner detention-related functions during a deficiency in its Federal Prisoner Detention budget, but it is likely that the "emergency" exceptions set forth in § 1342 and § 1515 of that statute would apply, in many, if not all, circumstances.

April 5, 2000

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
UNITED STATES MARSHALS SERVICE

## I. Introduction and Summary

Facing a possible deficiency in its FY 1999 Federal Prisoner Detention Budget ("FPD"), the Marshals Service sought our opinion on the potential applicability of certain exceptions to the Antideficiency Act, 31 U.S.C. §§ 1341–1342, 1349–1350, 1511–1519 (1994). *See* Memorandum for Randolph Moss, Acting Assistant Attorney General, Office of Legal Counsel, from Deborah C. Westbrook, General Counsel, United States Marshals Service, *Re: Possible Anti-Deficiency Act Violation — Request for Legal Opinion* (Dec. 23, 1998) ("USMS Memorandum"). In response to this request, we issued an interim opinion outlining the USMS's affirmative obligation to address the anticipated deficiency in the FPD appropriated budget either by procuring supplemental funding through reprogramming or by curtailing expenditures and obligations that would eventually cause a deficiency or necessitate supplemental appropriation. *See United States Marshals Service Obligation to Take Steps to Avoid Anticipated Appropriations Deficiency*, 23 Op. O.L.C. 105 (1999) ("Interim Opinion"). It is our understanding that, in the end, the Marshals Service was able to avoid the potential deficiency, and thus was not required to face the question of whether, and in what manner, it could continue to perform its mission after having expended all appropriated funds.

Although the current threat of deficiency has passed, you have asked that we nonetheless consider whether the "authorized by law" or "emergency" exceptions contained in the Antideficiency Act are applicable to the prisoner detention functions performed by the USMS. We conclude that it is doubtful that the "authorized by law" exception would permit the USMS to continue to provide prisoner detention-related functions during a deficiency, but it is likely that the USMS could in many, if not all, circumstances continue to perform detention functions under the "emergency" exceptions set forth in § 1342 and § 1515 of the Antideficiency Act. We stress, however, that this authority only permits entering into an obligation to make payment for services, and related material, during a period of deficiency and does not authorize actually making payment on such

47

obligations without returning to Congress for an appropriation. We also stress, as we did in our Interim Opinion, that the USMS would, if again faced with a risk of deficiency, have an affirmative obligation to take steps, to the extent possible, to avoid the deficiency.

## II. Analysis

As we indicated in our Interim Opinion, the Antideficiency Act reinforces the prohibition in Article 1, Section 9 of the Constitution that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7, by imposing administrative and criminal penalties on officers and employees of the United States Government and the District of Columbia who "make or authorize an expenditure or obligation exceeding an amount available in an appropriation" or "involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." *See* 31 U.S.C. § 1341; *see also id.* § 1349 (subjecting Antideficiency Act violators to "appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office"); *id.* § 1350 (imposing a criminal fine of not more than $5,000 and/or a term of imprisonment for not more than two years for Antideficiency Act violations). It establishes a broad prohibition against such expenditures, indeed even against attempts to incur obligations in excess of appropriated funds, and admits only two statutory exceptions, the exception for services "authorized by law" and for "emergencies involving the safety of human life or the protection of property." *See* 31 U.S.C. §§ 1341, 1342; *but see Armster v. United States Dist. Court for the Cent. Dist.*, 792 F.2d 1423 (9th Cir. 1986) (holding that Seventh Amendment right to a jury trial in civil cases precluded court system from suspending civil trials as part of an effort to comply with the Antideficiency Act).

Previously, we have most often examined the "authorized by law" and "emergency" exceptions in the context of a lapsed appropriation.[1] Your request calls for us to interpret those exceptions in the context of an appropriation that has not lapsed but, instead, is likely to be exceeded. We think our more recent precedents concerning lapsed appropriations are relevant to our analysis of the exceptions that apply where an agency has exhausted its appropriated funds and therefore review some of the history and principles outlined in our earlier memoranda.

---

[1] *See, e.g., Effect of Appropriations for Other Agencies and Branches on the Authority to Continue Department of Justice Functions During the Lapse in the Department's Appropriations,* 19 Op. O.L.C. 337 (1995); *Maintaining Essential Services in the District of Columbia in the Event Appropriations Cease,* 12 Op. O.L.C. 290 (1988); *Continuation of Agency Activities During a Lapse in Both Authorization and Appropriation,* 6 Op O.L.C. 555 (1982); *Payment of Travel Costs to Witnesses During a Period of Lapsed Appropriations,* 5 Op O.L.C. 429 (1981), *Applicability of the Antideficiency Act Upon a Lapse in an Agency's Appropriation,* 4A Op. O.L.C. 16 (1980)

A. "Authorized By Law" Exception of Section 1341 of the Antideficiency Act.

We begin with the "authorized by law" exception set forth in § 1341 of the Antideficiency Act, which was first incorporated into the statute in 1905. Act of Mar. 3, 1905, ch. 1484, § 4, 33 Stat. 1214, 1257; *see also* 39 Cong. Rec. 3690–92, 3780–81 (1905). Section 1341 provides, in relevant part, that:

> [a]n officer or employee of the United States Government or of the District of Columbia government may not — (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or] (B) involve either government in a contract or obligation for the payment of money before an appropriation is made *unless authorized by law*.

31 U.S.C. § 1341 (emphasis added). Although § 1341 creates a general prohibition against expenditures in excess of appropriations, we have interpreted its "authorized by law" provision to permit the obligation of funds in advance of appropriations, where such obligations are:

> (1) funded by moneys, the obligational authority of which is not limited to one year, e.g., multi-year appropriations; (2) authorized by statutes that expressly permit obligations in advance of appropriations; or (3) authorized by necessary implication from the specific terms of duties that have been imposed on, or of authorities that have been invested in, the agency.

*Authority for the Continuance of Government Functions During a Temporary Lapse in Appropriations*, 5 Op. O.L.C. 1, 5 (1981) ("1981 Civiletti Opinion").

Because the obligational authority for the FPD appropriations is limited to one year and we are aware of no statute expressly giving the USMS authority to carry out its prisoner detention functions despite a lack of available funds, the issue here is whether authority for the continuance of such functions during a funding deficiency can be inferred from the broadly defined powers and duties of the USMS. Under 28 U.S.C. § 566(a) (1994), the "primary role and mission of the United States Marshals Service" is "to provide for the security and to obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals and the Court of International Trade." Among other duties, the USMS must "execute all lawful writs, process, and orders issued under the authority of the United States," *id.* § 566(c); may make certain arrests, *id.* § 566(d); may provide defined protective services, *id.* § 566(e)(1)(A); and may "investigate such fugitive matters . . . as directed by the Attorney General," *id.*

§ 566(e)(1)(B). Moreover, in executing the laws of the United States, each U.S. Marshal is vested with the same sweeping authority as that vested under state law in the sheriff of the state in which the Marshal is serving. 28 U.S.C. § 564 (1994).

We doubt that the authority to obligate expenditures in the face of a deficiency can be inferred from the USMS duties described in § 566. Although the USMS is statutorily required to "execute[ ] and enforce all orders of the United States District Courts," including orders remanding prisoners to the custody of the USMS, and is authorized to arrest, and thus to hold, certain persons,[2] we have previously stated that "statutory authority to incur obligations in advance of appropriations . . . may not ordinarily be inferred, in the absence of appropriations, from the kind of broad, categorical authority, standing alone, that often appears . . . in the organic statutes of government agencies." 5 Op. O.L.C. at 4. A conclusion that obligations in excess of appropriations are "authorized by law" must be supported by something more than a finding that the functions for which the obligations are to be made can reasonably be said to fall within the agency's general responsibilities. *Id.* For that reason, Attorney General McReynolds concluded in a 1913 opinion that, without more, the Postmaster General's broad authority for operating the mail service would be insufficient authorization for attempting to avoid an interruption in such service by obligating funds in excess of appropriations to employ temporary mail carriers. *Postal Service — Employment of Temporary and Auxiliary Clerks and Letter Carriers,* 30 Op. Att'y Gen. 157, 160–61 (1913); *see also* 5 Op. O.L.C. at 5.

Although we recognize that there is an argument that the USMS's statutory obligation to "provide for the security . . . of the United States" confers the special authority contemplated by the "authorized by law" exception, we cannot conclude with any certainty that permission to continue the performance of prisoner detention functions in the face of a deficiency can reasonably be inferred from this provision. The legal and administrative precedents do not provide any clear direction on this point, but raise doubt about the argument. In your memorandum, you suggested that authorization for expenditures in excess of appropriation might be found in court orders requiring the USMS to transport and detain federal prisoners. USMS Memorandum at 4–6. In our view, the "authorized by law" exception must refer to congressional, as opposed to judicial, authorization to expend funds. The Antideficiency Act was intended to reaffirm *congressional* control of the purse. *See* Interim Opinion, 23 Op. O.L.C. at 108. As a result, it is necessary to consider whether Congress, at least implicitly, "authorized" the expenditure of funds in excess of appropriations in order to satisfy court orders

---

[2] *See* 28 U.S C §§ 564, 566(a) and (d) *See also* 28 C.F R. § 0 111(k) (1999) (Director of USMS shall direct and supervise "[s]ustention of custody of Federal prisoners from the time of their arrest by a marshal or their remand to a marshal by the court, until the prisoner is committed by order of the court to the custody of the Attorney General for the service of sentence, otherwise released from custody by the court, or returned to the custody of the U[nited] S[tates] Parole Commission or the Bureau of Prisons ")

requiring the USMS to detain prisoners. This inquiry, however, would seem to lead back to the guiding principle that statutory authority contained in an agency's organic statute generally provides an insufficient basis to satisfy the "authorized by law" exception to the Antideficiency Act. Thus, finding no clear authority for USMS detention-related expenditures in excess of appropriation, we look next to whether the prisoner detention functions performed by the USMS fall within the "emergency" exception contained in the Antideficiency Act.

B. "Emergency" Exception of Section 1342 of the Antideficiency Act.

The second exception from the Antideficiency Act's proscription is for "emergencies involving the safety of human life or the protection of property" and is contained in § 1342 of the Act. Under that provision,

> [a]n officer or employee of the United States Government or of the District of Columbia government may not accept voluntary services for either government or employ personal services exceeding that authorized by law *except for emergencies involving the safety of human life or the protection of property.*

31 U.S.C. § 1342 (emphasis added). Although this provision refers only to the acceptance of voluntary services, we have previously interpreted its exception also to permit agencies to "incur obligations in advance of appropriations for material to enable the employees involved to meet the emergency successfully." 5 Op. O.L.C. at 11. Significantly, this provision authorizes entering into obligations to pay for services, and related material, but it does not itself authorize making payment on any such obligations. *See* Memorandum for Alice Rivlin, Director, Office of Management and Budget, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Government Operations in the Event of a Lapse in Appropriations* at 6 (Aug. 16, 1995) ("Rivlin Memorandum"). Before payment could be made in case of a deficiency, it would be necessary to return to Congress for an appropriation. *See id.*

The exception for "emergencies" contained in § 1342 has long been recognized as an important component of the Antideficiency Act. 5 Op. O.L.C. at 8. It bears noting, however, that the earliest version of the statute, enacted in 1870, included no exception for emergency situations. *Id.* It set forth only a very general prohibition against the expenditure of "any sum in excess of appropriations" or "involv[ing] the Government in any contract for the future payment of money in excess of such appropriations." [3] Congress did not include an exception for

---

[3] *See* Rev Stat § 3679, Act of July 12, 1870, 16 Stat. 230, 251 As we noted in our Interim Opinion, the Antideficiency Act has been amended a number of times since its enactment in 1870 *See, e g.,* Act of Mar 3, 1905, ch 1484, § 4, 33 Stat. 1214, 1257, Act of Feb. 27, 1906, ch 510, § 3, 34 Stat 27, 48, Act of Aug 23,

Continued

emergencies until 1884, when, as part of an urgent deficiency appropriation, it enacted a measure designed to curb the incidence of claims for compensation stemming from the unauthorized provision of services to the government by non-governmental employees, and claims advanced by government employees seeking compensation for services performed after hours. 5 Op. O.L.C. at 8. Legislators were concerned that a complete ban on all "voluntary" or non-gratuitous services would impede federal "life-saving" measures undertaken during periods of lapsed or exhausted appropriations, and urged the adoption of an exception for emergency situations. *See* 15 Cong. Rec. 2143 (1884) (statement of Sen. Beck). The provision adopted in 1884 read as follows:

> To enable the Secretary of the Interior to pay the employees temporarily employed and rendering service in the Indian Office from January first up to July first, eighteen hundred and eighty-four, two thousand one hundred dollars, and *hereafter no Department or officer of the United States shall accept voluntary service for the Government or employ personal service in excess of that authorized by law except in cases of sudden emergency involving the loss of human life or the destruction of property.*

Act of May 1, 1884, ch. 37, 23 Stat. 15, 17 (emphasis added).

Congress amended other aspects of the Antideficiency Act in the years following initial adoption of the "emergency" exception, but did not alter that provision until 1950, when it enacted the modern version of the Antideficiency Act. *See* Act of Sept. 6, 1950, ch. 896, § 1211, 64 Stat. 595, 765. The Comptroller General and the Director of the Bureau of the Budget jointly proposed new language in a 1947 report to Congress recommending certain changes in the Antideficiency Act and its administration. *See Report and Recommendations by the Director of the Bureau of the Budget and the Comptroller General of the United States with respect to the Antideficiency Act and Related Legislation and Procedures* 29–31 (June 5, 1947) (attachment to Letter for Honorable Styles Bridges, Chairman, Senate Committee on Appropriations) ("Antideficiency Act Report"). Congress accepted this recommendation and revised the language concerning the provision of emergency services in the context of an appropriations deficiency as follows:

> No officer or employee of the United State shall accept voluntary service for the United States or employ personal service in excess

---

1912, ch. 350, § 6, 37 Stat 360, 414, Act of Sept. 6, 1950, ch. 896, § 1211, 64 Stat. 595, 765; Act of Aug 1, 1956, ch. 814, § 3, 70 Stat 782, 783, Pub. L. No 85–170, § 1401, 71 Stat 426, 440 (1957), Pub. L. No 93–344, § 1002, 88 Stat. 297, 332 (1974), Pub. L. No. 93–618, § 175(a), 88 Stat. 1978, 2011 (1975); Pub. L. No. 101–508, § 13213(a), 104 Stat. 1388, 1388–621 (1990).

> of that authorized by law, *except in cases of emergency involving the safety of human life or the protection of property.*

Act of Sept. 6, 1950, ch. 896, § 1211, 64 Stat. 595, 765 (emphasis added). Neither the 1947 report nor the legislative history sheds any light on why the language of this provision was amended to focus on "cases of emergency," rather than on "cases of sudden emergency." [4] In a 1981 opinion, however, Attorney General Civiletti inferred from the plain language of the amendment an intent "to broaden the authority for emergency employment." 5 Op. O.L.C. at 9. He explained that, "[i]n essence, [Congress] replaced the apparent suggestion of a need to show absolute necessity with a phrase more readily suggesting the sufficiency of a showing of reasonable necessity in connection with the safety of human life or the protection of property in general." *Id.* He also identified two rules for identifying the functions for which emergency services could be procured:

> First, there must be some reasonable and articulable connection between the function to be performed and the safety of human life or the protection of property. Second, there must be some reasonable likelihood that the safety of human life or the protection of property would be compromised, in some degree, by delay in the performance of the function in question.

*Id.* at 8.

In 1990, Congress added a clarifying statement to the "emergency" exception incorporated in the 1950 Act. The clarifying provision reads:

> As used in this section, the term "emergencies involving the safety of human life or the protection of property" does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property.

---

[4] The section of the 1947 Comptroller General and Bureau of the Budget report addressing this provision merely provides information on the desired effect of the revised language and explains that "[t]his clause is intended to permit apportionments on a basis indicating a necessity for a deficiency or a supplemental estimate when the rate of obligating an appropriation must be increased to provide for emergencies involving the safety of human life or the protection of property." Antideficiency Act Report at 29. Report sections discussing the predecessor to § 1515, which contains a similar "emergency" exception from the apportionment requirements of the Antideficiency Act, do, however, offer insight into the purpose underlying amendments made to the apportionment statute. The report drafters described the version of that statute employing the phrase "some extraordinary emergency or unusual circumstance which could not be anticipated at the time of making such an apportionment" as "vague." Antideficiency Act Report at 30 They also included the phrase "emergenc[ies] involving the safety of human life or the protection of property" in the draft bill included in the document they submitted to Congress *See* Antideficiency Act Report, att at 1; *see also* Act of Sept 6, 1950, ch 896, § 1211, 64 Stat. 595, 765 (incorporating a variation of the recommended language).

31 U.S.C. § 1342. The legislative history underlying the inclusion of the clarifying statement is sparse. *See* Rivlin Memorandum at 8. In a 1995 opinion, in which we considered the meaning of the 1990 amendment, we noted that the reference to the amendment appearing in a conference report concerning the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101–508, 104 Stat. 1388, suggests that the change was made to narrow the range of functions that could reasonably be understood to fall within the "emergency" exception, and to avoid the possibility that the 1981 Civiletti Opinion might be read to permit the continuance of too broad of an array of government services during a shutdown. The conference report explained that:

> The [bill] also makes conforming changes to title 31 of the United States Code to make clear that funds sequestered are not available for expenditure and that ongoing, regular operations of the Government cannot be sustained in the absence of appropriations, except in limited circumstances. These changes guard against what the conferees believe might be an overly broad interpretation of an opinion of the Attorney General issued on January 16, 1981, regarding the authority for the continuance of Government functions during the temporary lapse of appropriations, and affirm that the constitutional power of the purse resides with Congress.

H.R. Rep. No. 101–964, at 1170 (1990), *reprinted in* 1990 U.S.C.C.A.N. 2374, 2875. Although it is evident that the amendment was "intended to limit the coverage of [the term emergency], narrowing the circumstances that might otherwise be taken to constitute an emergency within the meaning of the statute," the amendment did not require a dramatic change in this Office's approach to and interpretation of the "emergency" exception. *See* Rivlin Memorandum at 8. We concluded that we might avoid misinterpretation of the 1981 Civiletti Opinion by replacing the phrase "in some degree" in the second of the interpretative rules outlined in the opinion with the phrase "in some significant degree," but we already were interpreting the "emergency" exception narrowly, encompassing only those cases of threat to human life or property in which "the threat can be reasonably said to [be] near at hand and demanding of immediate response." *Id.* at 7. The clarifying text added by the 1990 amendment merely provided a gloss on the term "emergency," reinforcing what is implicit in the concept of an emergency — that there must exist an imminent threat or set of circumstances requiring an immediate response or action. *Id.* at 8–9.

Against this backdrop, we now consider the question whether the prisoner-detention functions performed by the USMS fall within the "emergency" exception on the ground that a decision not to continue them in the face of an appropriations deficiency would pose a threat to the safety of human life or to property that

could reasonably be described as near at hand or imminent. As we have noted, under 28 U.S.C. § 566, the USMS must provide for the security of the United States courts, and is responsible for executing and enforcing federal court orders. *See also* 28 U.S.C. § 564 (providing Marshals with "the same powers which a sheriff of the State may exercise in executing the laws thereof"). In this capacity, and under its FPD appropriation, the USMS shoulders primary responsibility, not only for transporting prisoners ordered to appear in federal court, but also for providing them with food, shelter, and medical services during the pendency of their court proceedings. This task is usually accomplished through contracts executed with local jails and prisons for the care and supervision of federal detainees. In a typical year, the USMS has more than 20,000 such detainees in its custody.[5]

It is likely that even a temporary suspension of the prisoner detention functions provided by the USMS would in many, and perhaps all, circumstances create an emergency involving the safety of human life or the protection of property within the meaning of § 1342. Certainly, to the extent suspension of prisoner detention functions would require the release of dangerous prisoners, or would preclude the provision of essential prisoner care or supervision, the exception would apply. In our judgment, hardship of this sort is what Congress intended to avoid in creating an "emergency" exception to the Antideficiency Act, and it satisfies the rigorous § 1342 standard identified in our earlier opinions on this subject.

It is possible that the failure to perform specific FPD functions would not rise to this level, and that the failure to provide certain benefits to federal prisoners would pose no imminent threat to the safety of human life or the protection of property. Some prisoners, might, for example, be transferred to the custody of the Bureau of Prisons and some services provided to prisoners might be terminated without posing a risk to the safety of human life or the protection of property. For this reason, should an unavoidable deficiency occur in the future, it will be necessary to evaluate obligations on a case-by-case basis. It seems clear to us, however, that at least a substantial portion of FPD-related obligations will likely fall within the exception. The precise application of the "emergency" exception, however, cannot be specified in the abstract and will inevitably turn on particular facts and circumstances.

Our conclusion that many, if not all, FPD-related obligations will likely fall within the "emergency" exception is bolstered by administrative determinations previously made by the Office of Management and Budget ("OMB") in the context of anticipated or actual appropriations lapses. In September of 1980, OMB prepared for the possibility of an appropriations lapse by issuing a memorandum instructing agencies on the activities and functions that could lawfully continue in the event Congress failed to pass a continuing resolution for fiscal year 1981. The memorandum listed activities related to the "[c]are of prisoners and other

---

[5] *FY 1997 Annual Report of the U.S. Marshals Service* at 3–9 (1998).

persons in the custody of the United States'' among the functions protecting life and property for which obligations could be incurred without running afoul of § 1341's prohibition. Memorandum for Heads of Executive Departments and Agencies, from James T. McIntyre, Jr., Director, Office of Management and Budget, *Re: Agency Operations in the Absence of Appropriations* at 2 (Sept. 30, 1980). A year later, in 1981, OMB issued another memorandum listing prisoner care-related services among those agency services that could continue despite a lack of appropriations, when delay in the passage of an appropriation for fiscal year 1982 again required agencies to prepare for an orderly shutdown of non-essential government services and operations. Memorandum for Heads of Executive Departments and Agencies, from David A. Stockman, Director, Office of Management and Budget, *Re: Agency Operations in the Absence of Appropriations* at 2 (Nov. 17, 1981). Similarly, past policies of the Department of Justice regarding the continuation of operations during an appropriations lapse also provide support for our conclusion. In a 1996 memorandum approved by this Office, the Department of Justice listed ''functions relating to the incarceration of prisoners'' among those that could lawfully continue during a lapse in appropriations. Memorandum for Heads of Department Components, from Stephen R. Colgate, Assistant Attorney General for Administration, *Re: Effects of Continuing Resolutions on Department of Justice Resources*, att. at 4 (Apr. 1, 1996).

## C. Emergency Exception of Section 1515 of the Antideficiency Act.

We understand your request also to include the question whether the USMS could invoke the ''emergency'' exception as a basis for failing to apportion funds under § 1512 of the Antideficiency Act.[6] As we explained in our Interim Opinion, an ''emergency'' exception similar to that set forth in § 1342 applies to § 1512's apportionment requirement. *See* Interim Opinion, 23 Op. O.L.C. at 106 n.2. Section 1515(b)(1), (b)(1)(B) provides, *inter alia*, that

> an official may make, and the head of an executive agency may request, an apportionment under section 1512 of this title that would indicate a necessity for a deficiency or supplemental appropriation only when the official or agency head decides that the action is required because of . . . *an emergency involving the safety of human life, the protection of property, or the immediate welfare of individuals* . . . .

31 U.S.C. § 1515(b)(1), (b)(1)(B) (emphasis added).

---

[6] Section 1512(a) provides, in relevant part, that ''an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for [that] period '' 31 U S.C § 1512(a).

Although, as we indicated in our Interim Opinion, we think it unlikely that a finding that an agency qualifies for an exception to the apportionment requirements of § 1512 would also be enough automatically to exempt that agency from § 1341's more demanding mandate, *see* Interim Opinion, 23 Op. O.L.C. at 106 n.2, we think it clear that, if an agency's functions fall within § 1342's exception for emergency situations, the standard for the "emergency" exception under § 1515 also will be met. We have previously held that § 1342 and § 1515, "[a]s provisions containing the same language, enacted at the same time, and aimed at related purposes . . . should be deemed in *pari materia* and given a like construction," and can find no justification for following a different course in this case. 5 Op. O.L.C. at 9 n.11 (citing *Northcross v. Board of Educ.*, 412 U.S. 427, 428 (1973)); *see also* General Accounting Office, 2 *Principles of Federal Appropriations Law* 6–82 to 6–83 (2d ed. 1992). Thus, for the reasons identified in the previous section of this memorandum, we conclude that it is likely that many, if not all, of the prisoner-detention functions performed by the USMS would satisfy the § 1515 standard for "emergenc[ies] involving the safety of human life."

## Conclusion

We conclude that the § 1342 and § 1515 exceptions for "emergencies involving the safety of human life or the protection of property" would likely apply to many, if not all, of the USMS's prisoner-detention functions. A determination whether particular obligations would satisfy this narrow exception, however, cannot be made in the abstract and would require case-by-case evaluation. Although the conclusion we reach here would permit the USMS to continue many, if not all, of its prisoner detention-related functions despite a deficiency in its FPD budget, we reaffirm the principles articulated in our Interim Opinion, and thus emphasize that the USMS is not free to invoke the "emergency" exception in the absence of an actual deficiency in its apportioned funds or overall appropriation. The USMS is under a general statutory obligation to reduce its prisoner detention-related expenditures to avoid the need for deficiency spending.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*